Good morning, Your Honors. Good morning, Counsel. My name is Jennifer Kennedy. May it please the Court, my name is Jennifer Kennedy and I represent plaintiffs' appellants, the firefighters of Snohomish Regional Fire and Rescue. We call it SURFR. The firefighters, four of them, are here today in the courtroom. This Court should reverse the summary judgment granted to SURFR on undue hardship and should remand and render summary adjudication of the firefighters' prima facie case and the issue of undue hardship. The District Court mishandled the cross motions below and failed to apply the clarified standard for undue hardship in Groff v. DeJoy, which requires a showing of actual significant cost to business operations. Your Honors, I know you have a thousand pieces of paper in this voluminous record. There is one key fact that is the linchpin here, one key fact that would lead any rational juror to fine for the firefighters, and that is this. SURFR's claimed fear of the unvaccinated firefighters as an intolerable health and safety threat is completely irrational and it is not borne out by the undisputed evidence of SURFR's actual conduct. First, at the same time SURFR was barring its own unvaccinated firefighters and pushing them into unpaid suspension merely for being unvaccinated, SURFR was allowing unvaccinated firefighters from neighboring departments to respond to calls within SURFR's district and interact with its vaccinated crews. But SURFR wasn't the employer of those other districts, correct? That is correct, Your Honor, but they had mutual aid contracts. SURFR intentionally entered mutual aid contracts with all the surrounding departments. They're the hole in the donut. And every department around them accommodated their firefighters. So they were responding to calls constantly where they're – That tells us that SURFR behaved differently than the – made different decisions than the surrounding firefighters. Should SURFR, in order to have been consistent, should they have canceled those contracts? Actually, yes, Your Honor. If – and we'll see this in the rest of the evidence. If SURFR really wants to believe that they felt any unvaccinated firefighter was a risk to its own vaccinated firefighters, they should have amended the contracts, perhaps placed restrictions on who was allowed to respond in their district, and they didn't. They absolutely didn't. And that isn't the only unvaccinated firefighter they didn't fear, because an absurdity happened. The absurdity mentioned by this court in the case of Bacon v. Woodward. The very unvaccinated firefighters that they pushed out of their jobs had to scramble for new work. And lead plaintiff David Peterson found work with a neighboring department, Getchell Fire, and wound up working as an accommodated, unvaccinated firefighter, side by side with his same SURFR coworkers, that SURFR was banning him from being around. This is exactly what the Bacon court said was a complete absurdity. How does that make any sense? That you will ban a firefighter being near his coworkers when he's on your roster and on your dime, but when he's not, it doesn't matter. It's absurd and it's irrational, and it shows they didn't really fear them as a health and safety threat. Well, I want to ask a question about the record. So my understanding of the record is that the fire department puts forward an expert that gives them an opinion about the efficacy of vaccinations and that your clients have not put forward an expert. They have their own opinions about whether this is true or whether the vaccine makes a difference or not or whether masking is just as effective, but they don't have any sort of medical evidence on that point. Am I correct about that? You are correct. The expert is absolutely unrebutted, and SURFR makes a lot of hay with that, but it doesn't matter because the expert's opinion is not dispositive here. The men didn't ask for an accommodation from COVID and COVID-19 and the effects of the disease. They asked for accommodation in the workplace to the vaccination requirement. Right, but the argument was, yes, this is a problem, and we should be worried about spread and people getting sick, but we can solve that by masking and social distancing and testing frequently, right? Yes. But they say that based on their own opinion of, like, what's going to work in this circumstance, and what are we supposed to make of that as the court? Well, actually, it's not based on their own opinion. It's based on the reality of what actually occurred. The firefighters did present evidence of their two years of working safely and professionally under SURFR's exhaustive safety protocols. But at what point do we judge the employer's conduct? I mean, they've got to make a call at a certain point of time. You're asking us to second-guess at a later point of time whether that call was initially correct. Your Honor, actually, SURFR is asking you to second-guess and to rely on ex post facto hindsight speculation, because those two years where the men, the firefighters, were operating safely and professionally, using not only masking, testing, and social distancing under the playbook protocols, they were using crazy other decontamination, defogging, boot scrubbing, mask microwaving protocols. They succeeded. SURFR has put itself in an extremely odd and awkward position of here having to denigrate its own sworn officers and also to criticize its own safety policies. No matter what they say about, in this case, that masking could have been faulty, testing could have been faulty, social distancing might have been hard, that wasn't the truth on the ground at the time. Because the men testified that they absolutely rigorously followed those, and the evidence shows no fire-to-fighter transmission, no patient-provider transmission, no cost, and no burden, because their protocols worked. And even their expert contradicted himself. But you keep calling them firefighters. Aren't they actually paramedics? Firefighters in the state of Washington are required to also be either an EMT or a paramedic. But your clients, aren't they for the most part doing paramedic work? Oh, no, not necessarily. The work, the business operations of the fire department is fire suppression and emergency services. So, of course, they're doing all manner of firefighting activities. They are also being emergency medical services and transport. So they're having to be EMTs, though. I'm having trouble understanding what the accommodation could have possibly been that the employer should have granted these individuals. Your Honour, the accommodation had been happening for two years. They had been safely operating with the existing COVID virus, circulating globally, airborne, admitted by surfer to be transmitted by anyone talking and breathing normally. They'd been doing that for 20 months, observing these exhaustive safety protocols. Without even saying it, surfer had already been accommodating them. So when the government... And during that period, how long had we had a vaccine? Excuse me? How long had there been a vaccine during that period? You know, okay, beginning of pandemic, March of 2020, okay? The early vaccine was rolled out in about December of 2020. And that is around the time when health care providers were given early access to that. And, of course, some surfer firefighters chose to go get it. Surfer did not require it. They did never add it to the playbook. They never even tracked the vaccination status of its employees. Moving into 2021, then it became available to the general public. Still, surfer did not require it, did not add it to the playbook, did not even track it again. They didn't track vaccination status of their employees until Governor Inslee's mandate, until their own mandate, in, like, around October of 2021. Without saying they were accommodating, they were accommodating. They had proved that the men were doing a great job under those specific protocols that they themselves had developed. And John Lynch, the expert for surfer, he corroborated this. Contemporaneous to the time we're talking about, in September of 2021, John Lynch published a study with about 12 other co-authors. It was published by the CDC. It was conducted in the pre-vaccine, early pandemic days, around February 2020. And it was specifically King County EMS providers, and they were looking specifically at, is the PPE working? Are these protocols working? Is there a problem with transmission for our emergency personnel when we're just using masking, testing, PPE, et cetera? And to make it even harder, they were looking at AGPs, aerosol generating procedures, extremely intimate procedures, where you're going to be very near the breathing of perhaps a COVID-positive patient. And the study found it's going well. You're doing great. The PPE is working, even at a time when there was no vaccination. And so the conclusion that we would draw from that study is that we should continue with those protocols. Is that the conclusion? Judge Wybie, that's exactly what John Lynch said. But it doesn't mean that we can't adopt additional belt and suspenders. That is true. It absolutely doesn't say that. But the interesting thing about belt and suspenders is even John Lynch admits, they all admit, that vaccination itself works in concert with all these other protective measures. In his own report, he had a sheet called the Swiss Cheese Protection Program, where it shows each layer of protection adding another layer of possible protection with every item having holes in it. Masking isn't perfect. Testing isn't perfect. The vaccination isn't perfect. Even he admitted, this is a combination. But the thing is, their combination without vaccination was working. Vaccinated, unvaccinated firefighters were side by side, each observing these exhaustive protocols. And there's no evidence in the record, none, no cost, no burden, no hardship to surfer, in reality. What surfer is trying to do now. And we know that that would continue to be effective when there's a spike in COVID, because why? Well, again, Judge, there were spikes before. Recall the early pandemic with the original Wuhan strain. It was very virulent. There was a lot of concern about waves. And what we're looking at now is the Delta and the Omicron waves. All of this goes to Dr. Lynch's assessment of risk. And risk is something these firefighters eat for breakfast. Firefighters are trained in risk. They are trained in safety management. And you come all the way back around to the fact that they had these industry-specific protocols. They anticipated the risk, mitigated it, and responded to it, to inevitable COVID infection. Within their own ranks, they had a return-to-work guideline. They had a common-sense guideline. Chief O'Brien saying, if you got sick, you stayed home. We didn't want people who were sick at the workplace. And then the return-to-work guidelines led them back to recover at home safely. And then you get to come back to work. There was never a question of, if you get COVID, you're out. After the mandate, that was the stance they took, that it was vaccination, or basically termination. Because putting a man on unpaid suspension, indefinite unpaid suspension, for possibly up to three years, that's not an accommodation. That's a harm. We see the Fifth Circuit holding that to be an irreparable harm in Sombrano versus United Airlines. You cannot do that to a man and call that benevolence. You can't call it a flexible leave option. You can't even call it leave, because the men didn't want this. The firefighters wanted to keep working. And that was the accommodation they asked for. And in fact, that Chief O'Brien had told them he would be happy to do. Look at the timeline again. When you look at August of 2021, Governor Inslee comes out with that mandate. John Lynch is saying that from August of 2021 to April of 2022, that was the exact period that the men... To prove an undue hardship, we would have had to wait for actual spikes among the firefighters to be displayed. Just what point do you think undue hardship is triggered? The undue hardship, again, in this instance, under Groff, has to be significant cost to operations. Yeah, but give me an example of what would be taking place on the ground to justify a finding of undue hardship. The only thing, in my opinion, Your Honor, would be either a radical health and safety problem, and I'm just making this up because it didn't happen, massive amounts of COVID infections, massive amounts of absences. So the employer had to wait for that point to happen? No, they didn't have to wait because, again, number one, they had already been accommodating through wave after wave and variant after variant. Delta and Omicron weren't nothing new compared to what had already happened. They had done their own experiment, their own accommodation, without really realizing it, and they had done an excellent job. And so based on that true reality, there was no reason to expect that any new waves or new variants were going to cause something that had never happened. They had absences. They managed them. They had infections. They managed it. Do you want to save any time for rebuttal? Pardon? Do you want to save time for rebuttal? Yes, I would like to save three minutes for rebuttal. So you're down to 45 seconds. I'll give you two minutes for rebuttal. Thank you. Thank you, Your Honor. May it please the Court, I'm Shannon Phillips on behalf of Snohomish Regional Fire and Rescue from the Summit Law Group, also known as SURFR. This decision was made... There was a question from the panel about what point in time we're looking at. This decision was made by SURFR after the governor, in August 2021, during the Delta wave of COVID, when it was estimated that 1 in 172 Washingtonians had an active COVID case. Hospitals were full. Health care workers were strained. The governor made a decision that health care workers would be required to be vaccinated in order to, quote, protect everyone, including persons who cannot be vaccinated for medical reasons, youth who are not eligible to receive a vaccine, immunocompromised individuals, and vulnerable persons, including persons in health care facilities, long-term care facilities, and other congregate care facilities from COVID-19. SURFR employed 192 health care providers. These are firefighter EMTs, and 85% of what they do in responding to emergency calls is providing health care. They go into people's homes. They go into prisons. They go into long-term care facilities that were the epicenter of some of the COVID outbreaks and where the person calling 911 might be one of the most vulnerable people to COVID. I think that's a very compelling argument, but what do you do with her point about if that was such a concern, why were firefighters from other places being, who were not vaccinated, being allowed to work alongside your people? So appellants would like this to be like the Bacon case, and that was a case on the pleadings. And so what the court seemed to think was a possibility in Bacon was that Spokane dismissed firefighters and then hired contract workers to replace them who were unvaccinated. That's not the evidence in the record here. Again, every health care provider, like a fire agency, was required to determine, are its health care workers vaccinated? If not, can we reasonably accommodate them? Appellants say, well, there are interlocal agreements. There is not an interlocal agreement in the record. It doesn't say when that's used. So, yes, you can imagine if there are surrounding areas around a fire district and maybe there's a five-alarm fire and multiple units need to respond, and so we call on each other. There is no evidence in the record that people from other jurisdictions were living 24-7 in a firehouse. That is part of the danger. You are sleeping, you are eating, you are using the showers. It is like your home, where you cannot wear a mask all the time. So there's no evidence that people from other fire districts were coming and living in the firehouse. They are not driving. So that goes to a concern about infection amongst the firefighters. But I understood one of your arguments to be we need to be extra careful in this circumstance because of the work that's being done here because we're engaging with vulnerable people out in the public, the people who are calling for EMS services. And that starts to fall apart a bit if people responding to that, some are vaccinated and some are not, and you guys are allowing that to happen. That seems inconsistent and as your friend across the aisle suggests, arbitrary. So again, we are looking at could we have accommodated the firefighters without undue burden to SURFR's operations? There's no evidence in the record at the end of discovery and on summary judgment that SURFR was sending firefighters or EMS workers from any other jurisdiction to respond to medical calls. That is not in the record. But again, when SURFR is looking at okay, what are our costs? Are our firefighters more likely to become infected, more likely to transmit COVID to someone else? SURFR relied on agencies like the CDC, the State Department of Health to say yes, unvaccinated people at that time were more likely to contract and transmit COVID. So if we are sending our employees out on an EMS call, they are more likely to get COVID, they're more likely to transmit it to their fellow workers as they're driving in those vehicles together. And when they go into that home, our employees are more likely to transmit COVID even with the other precautions to patients. It doesn't mean, you know, firefighters have to live in the world. So they are going out into prisons where they're very likely are unvaccinated people. They are going into homes where people might be unable to be vaccinated. They're not vaccinated. They probably are not wearing masks in their home even if a firefighter comes into the room and then says, put on a mask, they haven't been wearing it. It's an aerosolized virus. So the risk exists from COVID. SURFR's obligation was not to eliminate all risks of COVID. It was to say, can we have unvaccinated healthcare providers performing in their healthcare roles without imposing an undue burden? And what SURFR said is, if they are unvaccinated, based on reliable evidence we have from public health authorities, they are more likely to get COVID. They're more likely to transmit COVID to others. If that happens, we could have people out of work. Again, you look at the records. SURFR had plaintiffs' appellants don't say people didn't get COVID. They claim, unscientifically, that they never had COVID and never transmitted it to anyone. But they don't actually say that people didn't get COVID. They said, oh, people got COVID, they left the workplace, they came back to the workplace. That's a disruption to SURFR's operations. If someone believes, learns that, wait a minute, there was this requirement for vaccination and yet you sent into my home an unvaccinated firefighter and the person who called for service got COVID and died, there is a possibility of a legal risk to SURFR if that person makes a claim. SURFR made the decision, we want to reduce the likelihood of that. SURFR had a $375,000 contract to provide services, EMS services, to the state prison. The prison sent a letter saying, we will not allow unvaccinated people into our facilities. I want to ask a question on that point because I thought that was a fairly compelling piece of evidence that undue burden to the operations. If the fire department is going to lose this very lucrative contract with the state because they can't provide services under the conditions the state is requiring, that seems compelling. But the record is a little bit murky on this point and fairly vague in that the prison sends out this letter saying, we want everybody vaccinated, but maybe in practice, they didn't actually require everybody to be vaccinated. And I also don't have any sense from the record, unless I've missed it, about what that actually meant for you. Like, if you didn't have the vaccine mandate, you did have people that were nonetheless voluntarily vaccinated. And so couldn't you have just sent those guys to the prison when necessary? Well, they sent the letter after the requirement was put into place. So it was in fall of 2021. They sent the letter saying, there is a requirement. We are requiring that if you have a contract with us, you may only send unvaccinated firefighters. That is a burden to operations. We know that SURFR had a dozen different firehouses. It's stationed by different rotations of people. So the idea that, okay, if we receive a 911 call from the prison for emergency services, we are going to try and figure out, is the person who is on staff that day to drive a specific vehicle, well, they can't drive when that call comes in. Are we going to get somebody from a farther away station? So that is an impact on operations if it is not able to respond. Now, the appellants have also said, well, you know, there is never a letter later on saying that you could let unvaccinated people in and you brought us back in spring 2022. SURFR, the record shows, was making appropriate risk calculations throughout this. In fall of 2021, having come off the tail end of the Delta variant, they said, we think the risks are too high. I mean, you can even, again, you don't look in your workplace and say, can I see science happening here and judge based on that? But you can see in the records that SURFR had four cases of COVID. Again, could be underreported because that's people reporting that they had COVID. They have to know, they have to have symptoms, they have to get tested. It had seven in August as the Delta wave was happening. So this was happening in the world. I guess I'm not understanding what you're saying in terms of whether there's an undue burden on the fire department depends with relation to the Department of Corrections contract. Depends on the Department of Corrections judgment, not on the fire department's judgment. So you're saying the fire department was making risk assessments over time based on the circumstances it was facing and it changed its risk assessment. And at one point it said, everybody's got to be vaccinated. And later it said, no, things have changed. Everybody doesn't have to be vaccinated. With regard to the DOC contract though, like what is DOC's position there? Did they ever let people come in that weren't vaccinated? We don't know what DOC did. What does this record tell us? The record tells us that they told us, you as a contract holder, we are paying you $375,000 a year to send people and do these services and you will be in violation of your agreement with us if you send in unvaccinated people. So that's what they told us. Again, at a time where risks of COVID were very heightened. So Surfer looked at that and said, COVID is very prevalent right now. We think that's a legitimate risk that one of our firefighters who's unvaccinated goes into a prison, there's an outbreak, the prison says, you caused this outbreak, you violated our contract, we're no longer working with you. That was one of many of the things they considered as the cost. Again, top of the list is the risk to coworkers, patients, and the public who are being served. This is one of them. There's risks of liability as well. But they're looking at over time, the plaintiffs say, well, nothing was wrong because you brought us back in spring of 2022. Again, what the record shows is throughout this time, Surfer is balancing. As Dr. Lynch said, if Surfer wanted to be 100% safe, it would have its firefighters stay at home and never leave the house, because that's the only way you're going to be safe from COVID. Well, Surfer's mission is to save lives by providing emergency medical services, by providing fire suppression. So it doesn't want to do that. But it's trying to balance the risks from COVID, the potential costs from COVID, and being able to have its highly trained EMS and firefighters, workers, go out and provide those services. By the time it got to April 2022, the conditions had changed. COVID conditions had changed. We were out of the Omicron wave. There were lower community incidents of COVID, lower hospitalizations. Courts have also said it's appropriate to look at the overall burden based on the number of people requesting accommodations. In fall of 2021, one quarter of Surfer's firefighter EMT paramedics wanted to be exempt from the vaccination requirement. By the time it got to April, there were only 11 firefighters who were asking for an accommodation. So that is a much different risk calculus of, do we have one quarter of our firefighters who are unvaccinated? What is the risk of transmission within our community of firefighters to patients? What is the risk if at a lower time of incidents in the community, we only have 11? Your Honor, multiple courts in the, in the health care context have recognized that the kind of evidence that Surfer relied on in making his decision, relying on public health authorities have an indish of a reliability showing there is an increased risk of COVID, of firefighters getting COVID and transmitting it to others. That alone is an undue burden on operations where the mission of the hospital, the fire department, et cetera, is to provide healthcare, to save lives. That is the situation here with Surfer. It's decision that it was an undue burden is reasonably based on the evidence that was available to it in fall of 2021. And then again, when it modified its decision in spring of 2022, for that reason, we're asking the court to uphold the decision of the trial court. Thank you. Thank you, counsel. All right. We'll put two minutes on the clock for rebuttal. I'm sorry to eat up your two minutes, but I mean, help me understand. I thought you were telling us that there was locality agreements in place and I was assuming there was some kind of written agreements. Is that right? Or wrong? That is correct. They are called mutual aid contracts. They are entered into by Surfer with the department. They choose to do that. That's an intentional contract. It's very common. So I'm not sure what my friend was saying about that. But Surfer is not reaching out and, like, hiring people to come in. They respond on mutual aid to calls. There are two kinds of mutual aid. There's automatic mutual aid where they are just sent in, and there's requested. So there's always a chance that you're going to have a separate department showing up on a response call. And this happened routinely, which just goes to show Surfer didn't care if the unvaccinated firefighters showed up. It didn't control that. It may have cared. They could have stopped, Your Honor. They could have, if they really cared. And then risked having to go and respond to something that they were unable to control by themselves. It never happened, Your Honor. But never happened is hindsight. That's what this case is about. That's all this case is about. Is Surfer is saying, in hindsight, ex post facto, what might have occurred, but the reality on the ground, the evidence in the record. That's not hindsight, counsel. I think you've misused that term. All right, Your Honor. You know what? Speaking of the record, I do want to tell you about the prison. What is in the record is that Lieutenant Jay Stickney got his replacement job with the Central Mason Department. They accommodated their firefighters, and they serviced the prison. So, yes, the DOC did allow unvaccinated firefighters in. Your Honors, reality. What page of the record establishes that? I'm sorry. It's not right in front of me. But it is in the record. Absolutely. Can you point me to, like, a particular declaration? Yes. Lieutenant Jay Stickney. It's going to either be in his. It's either going to be in a reprieve brief. It will be in. There are two declarations for each man. But just to be clear, what's in the record is that the corrections department knew that an unvaccinated person was being sent in, and they acquiesced to that? Yes, 100%. They absolutely did. When you look, Your Honor, when you look at the letter that the Department of Corrections sent out, the one piece of evidence that they claim indicated the contract might be breached, you see that it's a form letter basically restating the proclamation and stating, also, please let us know if you've accommodated anyone. It contemplates accommodations. By the way, Your Honors, also, the only reason that Surfer has brought up the contract is because they claim one quarter of the workforce, that number, that 46. But look at the papers, please. Every time they say 46, it's with requested accommodation or requested exemption. There's no specifics. And Chief O'Brien himself admitted that it was 11.  You're out of time. Other questions from the bench? No, thank you. All right. Thank you, Counsel. Thank you, Your Honor. We appreciate the helpful argument. The matter of Peterson v. Nahomish Regional Fire. I'm not looking at it. Regional Fire and Rescue is submitted. And we will turn to the second case.
judges: BYBEE, FORREST, Rodriguez